IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TRUDY KNORR,** | ) |
| | ) |
|       **Plaintiff,** | ) |
| | ) |
| vs. | )   **Case No.** 14-cv-1378-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
|       **Defendant.** | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Trudy Knorr is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

**Procedural History**

Plaintiff applied for DIB on November 28, 2011. In her application she alleged disability beginning on July 10, 2010. (Tr. 19, 21). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Anne Sharrard denied the application in a decision dated September 16, 2013. (Tr. 12-23). Plaintiff's request for review was denied by the Appeals Council, and the decision of the

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 12.

ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ failed to properly consider fibromyalgia at Step two of the sequential evaluation.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically

2

> determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** See also, ***Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the

3

five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)(citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))**.

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920,**

**921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Sharrard followed the five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of cervical and lumbar degenerative disc disease, neuropathy, migraine headaches, depression, and anxiety. (Tr. 21). The ALJ further determined that these impairments do not meet or equal a listed impairment. (Tr. 23).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light level with physical limitations and mental limitations. (Tr. 25). Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was unable to perform her past relevant work. However, she was not disabled because she was able to do other work that existed in significant numbers in the regional and national economies. (Tr. 37-38).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

**1. Agency Forms**

Plaintiff was born on November 11, 1962 and was forty-eight years old at her alleged onset date. She was insured for DIB through September 30, 2012. (Tr. 211). She was five feet eight inches tall and weighed one hundred and

5

eighty-three pounds. (Tr. 215). She completed two years of college in 1995 but had no specialized training. (Tr. 216). She previously worked as a barn manager at a stable, machine operator at a plastic manufacturer, a clerk at a convenient store, a gas station attendant, a crew member at McDonalds, and a customer service agent at a call center. (Tr. 217).

According to plaintiff, her arthritis, seizures, peripheral neuropathy, borderline diabetes, bulging discs, hypothyroidism, carpal tunnel, anxiety, and migraines limited her ability to perform work. (Tr. 215). Plaintiff took Synthroid for hypothyroidism, Wellbutrin and Zoloft for anxiety, Vicodin and ibuprofen for pain, and Flexeril for muscle spasms. She claimed ibuprofen and Vicodin caused her to have an upset stomach and Wellbutrin caused mood swings. (Tr. 249).

Plaintiff submitted a function report in February 2012. (Tr. 226-33). She stated that constant pain and side effects from her medications limited her ability to work. (Tr. 226). She lived with her two sons who helped her with the laundry, meal preparation, and cleaning. On a daily basis, she took her son to school, performed household duties, napped, took occasional trips to the store, made dinner, and went back to bed. (Tr. 227). She typically prepared simple meals three or four times per week. (Tr. 228). Plaintiff was able to drive and went to the store once a week. (Tr. 229). She could handle her finances. (Tr. 229-30).

Plaintiff stated her pain causes her to be irritable and depressed. (Tr. 231). She rarely went out with friends and could no longer ride horses. (Tr. 230-31).

6

She claimed she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using her hands, seeing, remembering, completing tasks, getting along with others, and concentrating. (Tr. 231). Plaintiff stated she avoided interaction with authority figures and had difficulty handling stress. (Tr. 232). She also stated her Vicodin, Flexeril, Zoloft, and Wellbutrin all caused sleepiness. (Tr. 233).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing on July 31, 2013. (Tr. 56). She was fifty years old and weighed one hundred and seventy-six pounds. (Tr. 59, 62). At the time of the hearing she lived with her ex-husband, but she was in the process of moving to live with her daughter, son, and three grandchildren. (Tr. 61). She had an associate's degree in general studies and completed several years of college before having to drop out due to her father's declining health. (Tr. 63, 94). She received child support and maintenance from her ex-husband and had a medical card. (Tr. 64-67). Previously, plaintiff worked as a respiratory therapist, plastic press molder, fast food worker, and stable hand. (Tr. 98). She also occasionally worked at a barn in exchange for her horse's boarding and feed costs. (Tr. 65).

Plaintiff stated that she typically had pain all over her body and frequently dropped things. (Tr. 69-70). The most she was able to carry was a gallon of milk. (Tr. 71). Plaintiff also stated that her vision had deteriorated as a result of fibromyalgia. Glasses were no longer helpful and she had difficulty driving at night. (Tr. 70-71). Plaintiff stated her arthritis was spreading from her thoracic

7

spine into her ribs and lower back. (Tr. 77). At the time of the hearing, she was taking Robaxin as a muscle relaxer, Meloxicam as an anti-inflammatory, Percocet and Vicodin for pain, Effexor for depression, and Topamax for migraines. (Tr. 73). She also took synthyroid for hypothyroidism. (Tr. 72). The only pill she did not take daily was Percocet because it made her unable to concentrate. She also stated that she experienced the side effects of nausea, loss of appetite, irritable bowels, and mood swings from her other medications. Plaintiff was unable to try different medications because Medicaid would not cover their costs. (Tr. 74).

Plaintiff thought she could sit for about fifteen to twenty minutes and she could stand for about five to ten minutes at a time. She could walk half a block before needing to rest and could only lift her arms to shoulder height. (Tr. 75, 78). Her hands were stiff in the morning and she could not perform fine motor skills for the first half of the day. (Tr. 78). Changes in the weather made her pain worse. (Tr. 80). Her memory was poor and she was only able to concentrate when she had a "low pain day." (Tr. 86). She also testified that she had panic attacks and did not sleep well. (Tr. 86, 99).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical that comported with the ultimate RFC assessment, that is, a person with plaintiff's age and work history who was able to perform work at the light level. The person would require a sit or stand option at will, and could never climb ladders, ropes, or scaffolds. The person could occasionally climb ramps, stairs, and occasionally balance, stoop, kneel, crouch, and crawl. Additionally, the

person could never reach overhead bilaterally and was limited to frequent fingering and handling bilaterally. The person would be limited to simple, routine, and repetitive tasks in a low stress job with only occasional changes. Finally, the person would need to only have occasional interaction with co-workers and brief and superficial interactions with the general public. (Tr. 104).

The VE testified that this person could not perform any of plaintiff's past relevant work. (Tr. 105). However, she could do jobs that exist in significant numbers in the national economy. Examples of such jobs are usher, charge account clerk, and document preparer. (Tr. 108-09). The VE testified that if the individual were to miss more than one day a month on average it would preclude employment. (Tr. 110). Additionally, if the person was off task fifteen percent of the time she would not be able to maintain employment. (Tr. 111).

### 3. Medical Evidence

Plaintiff's records with her primary care physician Dr. Marjorie Guthrie begin in January 2008 when plaintiff presented with insomnia and back pain. She stated that she had joint pain in several places but her back pain was the most painful. (Tr. 503). Plaintiff was seen several times by Dr. Guthrie prior to her alleged onset date with widespread pain and fatigue. (*Ex.*, Tr. 487, 475, 462, 455, 447, 444, 423, 410).

In July 2010, plaintiff presented to Dr. Guthrie reporting joint pain in her back, shoulders, and knees. (Tr. 400). Plaintiff returned to Dr. Guthrie in December 2010 reporting fatigue and depression. (Tr. 389). Thereafter, plaintiff returned to Dr. Guthrie over ten times prior to her date last insured. She

consistently reported fatigue, diffuse pain, depression, anxiety, and headaches. (Tr. 332, 342, 347, 352, 366, 375, 620, 624, 630, 632, 696). Dr. Guthrie repeatedly diagnosed plaintiff with osteoarthritis not otherwise specified, migraines, depression, anxiety, neuropathy, and hypothyroidism. **Ibid.**

Dr. Guthrie performed a variety of tests to determine the etiology of plaintiff's widespread chronic pain. Her bloodwork was typically normal and there were no definitive signs of arthritis on her X-rays. (Tr. 521-29, 666-69). Dr. Guthrie gave plaintiff steroid shots for hip pain and prescribed several different medications to try to reduce plaintiff's pain, depression, and anxiety. (*Ex.*, Tr. 366-89, 332, 352, 375, 630). In September 2012, Dr. Guthrie referred plaintiff to a rheumatologist to rule out lupus as a cause of plaintiff's pain. (Tr. 696).

In February 2013, five months after plaintiff's date last insured, plaintiff was seen by rheumatologist Dr. Jonathan Miner. After running several tests, he determined plaintiff's symptoms were consistent with fibromyalgia. He also diagnosed plaintiff with possible carpal tunnel syndrome, and possible Raynaud phenomenon. (Tr. 724-26).

Plaintiff reported to St. Joseph's Hospital Emergency Room in November 2011 with a severe headache, facial numbness, and blurred vision. (Tr. 288). Plaintiff returned to St. Joseph's Emergency Room in February 2012 reporting severe chest pain for three days. (Tr. 554-58). On a follow up with Dr. Guthrie this chest pain was attributed to anxiety. (Tr. 624). In October 2012, plaintiff once again returned to St. Joseph's Emergency Room, but presented with

bilateral flank pain. (Tr. 673). Initially the doctors thought this could be kidney pain, but after tests the etiology was unknown. (Tr. 677)

### 4. Opinions of Treating Physician

Dr. Guthrie completed two assessments of plaintiff's capabilities. (Tr. 533-34, 733-39). In January 2012, Dr. Guthrie completed a medical source statement that indicated plaintiff could lift or carry five pounds frequently and ten pounds occasionally. (Tr. 533). She opined that plaintiff could stand or walk for fifteen minutes at a time for no more than two hours out of an eight hour day. Plaintiff could sit continuously for thirty minutes at a time but could only sit for less than an hour total in a workday. Dr. Guthrie stated plaintiff could not push or pull more than five to ten pounds. (Tr. 533). She also opined that plaintiff could never climb or balance, and could only occasionally stoop, kneel, crouch, crawl, reach, handle, finger, and feel. She felt plaintiff needed to avoid all exposure to vibration, hazards, and heights, and avoid moderate exposure to extreme heat and cold, weather, wetness, and dust. Finally, Dr. Guthrie stated that plaintiff would need to lie down or recline to alleviate pain every fifteen to thirty minutes for fifteen to thirty minutes at a time. (Tr. 534).

Dr. Guthrie's second assessment was a fibromyalgia residual functional capacity questionnaire in July 2013. This was ten months after plaintiff's date last insured. (Tr. 733-39). She indicated plaintiff met the American Rheumatological criteria for fibromyalgia but her prognosis was fair. Dr. Guthrie referred to her medical records for evidence of frequent visits, medication changes, and tests. (Tr. 733). She opined that plaintiff had multiple

tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, Temporomandibular Joint Dysfunction, numbness and tingling, Sicca symptoms, Raynaud's phenomenon, breathlessness, anxiety, panic attacks, depression, hypothyroidism, carpal tunnel syndrome, and chronic fatigue syndrome. (Tr. 735).

Dr. Guthrie's assessment indicated plaintiff had bilateral pain in most areas of her body that was a five to eight out of ten on a pain scale. (Tr. 735-36). She felt plaintiff's experience of pain would often interfere with attention and concentration but that she was still capable of low stress jobs. (Tr. 736). She thought plaintiff would be absent from work about four times a month due to her impairments or treatments. (Tr. 739).

### 5. Consultative Examination

In February 2012, plaintiff had a physical consultative examination with state agency physician, Dr. Raymond Leung. (Tr. 536-39). Plaintiff indicated she had diabetes, hypertension, neuropathy, carpal tunnel syndrome, low back pain, hypothyroidism, seizures, and migraine headaches. (Tr. 536-37). Plaintiff's speech and hearing were within normal limits but she had difficulty picking up a penny from the table with her hands. (Tr. 537). The majority of plaintiff's examination was unremarkable. (Tr. 538). However, plaintiff had decreased sensation to light touch and pinprick in her hands and feet. She also had mild to moderate decreased vibratory sensation in the feet. Her reflexes were 2+ and equal. Dr. Leung's impressions were hypertension, diabetes

mellitus, neuropathy in her hands and feet, lumbar disc disease, hypothyroidism, seizures, and migraine headaches. (Tr. 540).

### 6. RFC Assessment

In March 2012, state agency physician Dr. Lenore Gonzalez completed a physical residual functional capacity (RFC) assessment. (Tr. 605-11). She opined that plaintiff could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds. Additionally, plaintiff could sit, stand, or walk for about six hours out of an eight hour workday. (Tr. 605). Dr. Gonzalez stated that plaintiff could occasionally climb ramps, stairs, ladders, ropes, scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 606). Plaintiff was limited to frequent handling and fingering bilaterally and had no visual limitations. (Tr. 607).

## Analysis

Plaintiff contends the ALJ erred in failing to find fibromyalgia a severe impairment. Plaintiff argues that the effects of fibromyalgia, such as fatigue and the location and intensity of pain, were not properly considered as a result of the ALJ's omission and that this error warrants reversal.

### 1. Step Two Error

At step two of the sequential evaluation the ALJ must determine whether a claimant has an impairment or combination of impairments that is severe. **20 C.F.R. §404.1520(a)(4)(ii).** The Seventh Circuit has held that in order for an impairment to be considered severe it "must significantly limit an

individual's ability to perform basic work activities." ***Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).**

The Social Security Administration (SSA) created guidance for establishing if a person has the medically determinable impairment of fibromyalgia in **SSR 12-2p**. In **12-2p**, the SSA states that a person will be found to have fibromyalgia "if the physician diagnosed [fibromyalgia] and provides the evidence we describe in section II.A or section II.B, and the physician's diagnosis is not inconsistent with the other evidence in the person's case record."

**Section II.A** requires "a history of widespread pain . . . for at least three months," "[a]t least 11 positive tender points on physical examination," and "[e]vidence that other disorders that could cause the symptoms or signs were excluded." **Section II.B** requires a "a history of widespread pain . . . for at least three months," "repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome," and "[e]vidence that other disorders that could cause the symptoms or signs were excluded."

The ALJ referred to SSR 12-2p and concluded that plaintiff's fibromyalgia was not a severe impairment because she was not diagnosed with the disorder until five months after her date last insured. Further, the ALJ reasoned that plaintiff did not display evidence of tender point sites or repeated manifestations of fibromyalgia like symptoms prior to the date last insured. (Tr.

23). The Commissioner states that plaintiff "offered no evidence indicating that her February 2013 diagnosis related back to the period on or before the expiration of her September 30, 2012 date last insured."

As plaintiff notes, the Seventh Circuit has stated that "the critical date is the date of onset of disability, not the date of diagnosis." ***Lichter v. Bowen, 814 F.2d 430, 435 (7th Cir. 1987).*** Additionally, the SSA has provided guidance for impairments that may not have a precise onset date in **SSR 83-20. SSR 83-20, at \*3** states in relevant part, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." And, "[c]onvincing rationale must be given for the date selected."

Here, both the Commissioner and ALJ erred by stating there is no evidence of repeated manifestations of fibromyalgia like symptoms prior to the date last insured. Plaintiff's history with Dr. Guthrie indicates difficulty with fatigue (Tr. 343, 363, 367, 375, 383, 389, 624), waking unrefreshed after a full night of sleep (Tr. 383, 389), anxiety (Tr. 333, 343, 366, 620), and depression (Tr. 333, 343, 366, 431, 389, 444). These are the exact symptoms that SSR 12-2p states are indicative that a claimant has the severe impairment of fibromyalgia. In addition, the Mayo Clinic advises that people with fibromyalgia often have headaches and sleep disorders.[2] Plaintiff reported to both the emergency room and Dr. Guthrie complaining of headaches (Tr. 283, 288, 343,

---

[2] See, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/symptoms/con-20019243, explaining how widespread pain, fatigue, cognitive disorders, and depression, headaches, and pain were common symptoms of fibromyalgia.

347, 352), and repeatedly stated she had difficulty sleeping. (Tr. 343, 383, 455).

These symptoms all occurred *prior* to her date last insured; however plaintiff was not referred to a rheumatologist until a few weeks before her DIB ended. Seemingly, ALJ Sharrard entirely discounted plaintiff's symptoms of fibromyalgia because she was not properly diagnosed in time. The ALJ also discounted plaintiff's frequent reports of arthritic pain since there were no clinical or diagnostic techniques diagnosing arthritis. (Tr. 22). This would make sense in light of fibromyalgia, as the constant achiness plaintiff experienced is consistent with fibromyalgia symptoms and "[t]here are no laboratory tests for the presence or severity of fibromyalgia." **Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).**

Plaintiff had widespread pain that was diagnosed as "osteoarthritis not otherwise specified" for years. (*Ex.*, Tr. 333, 343, 366, 620, 696). The widespread general "arthritic" pain with a lack of positive signs in testing was potentially indicative of plaintiff's onset of fibromyalgia. The ALJ's failure to contemplate it as such, as well as not discussing plaintiff's other symptoms in line with SSR 12-2p's requirements, is error. The Court notes that determining the onset date can be difficult in a case such as this. However, that does not excuse the ALJ from fixing a date that is supported by the evidence and setting forth a convincing rationale for her determination.

As an aside, **SSR 83-20** also provides that the ALJ "should" consult a medical expert if the date of onset must be inferred. Plaintiff argues that it was

16

mandatory for ALJ Sharrard to consult an expert. However, the Seventh Circuit has held that "should" does not mean "must" or "shall." **Eichstadt v. Astrue, 534 F.3d 663, 667 (7th Cir. 2008)**. Where the medical evidence is complete, the ALJ is not required to consult a medical expert. **Henderson v. Apfel, 179 F.3d 507, 513.** See, also, **Pugh v. Bowen, 870 F.2d 1271, 1278 n. 9 (7th Cir.1989)**. Accordingly, this Court does *not* hold that ALJ Sharrard erred in failing to consult a medical expert regarding the date of onset. However, the Court notes that the ALJ certainly could have consulted a medical expert on the issue. Perhaps, since determining the date of onset is difficult in a case such as this, the ALJ would be wise to do so on remand.

## 2. RFC Assessment

A step two error, however, is not necessarily reversible. The Commissioner cites to **Castile v. Astrue** which states that "[a]s long as the administrative law judge (ALJ) determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. Therefore, the step two determination of severity is merely a threshold requirement." **617 F.3d 923, 926-27 (7th Cir. 2010).** In citing this opinion, the Commissioner argues that since the ALJ found other severe impairments the failure to find fibromyalgia to be severe is of "no consequence." The Commissioner is incorrect.

While the Commissioner correctly cites the Seventh Circuit's opinion in **Castile**, she fails to acknowledge the Seventh Circuit has also held that the severity of an applicant's conditions is not only analyzed in the second step of

17

the opinion. Importantly, "[i]t also affects the ALJ's determination of residual functional capacity, for example, and thus, no matter what happens at step two, a correct assessment remains important." **Farrell v. Astrue, 692 F.3d 767, 773 (7th Cir. 2012).** Consequently, while a step two error may not be reversible by itself, the ALJ must cure the error by properly evaluating all the evidence when making the RFC assessment. **See Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012).**

"Therefore, failure to evaluate the limitations caused by the impairments that were found to be non-severe in step two is reversible error, and a step two error thus raises a red-flag for such reversible error during an ALJ's RFC assessment." **Cole v. Colvin, 2015 U.S. Dist. LEXIS 53907 at \*15 (S.D. Ind. Apr. 1, 2015).** Here, if ALJ Sharrard failed to incorporate the limitations caused by plaintiff's fibromyalgia into her RFC assessment then reversal is warranted.

The ALJ barely mentions plaintiff's well documented fatigue stating that "Dr. Guthrie felt her fatigue was due to pain." (Tr. 22). Fatigue is a common symptom of fibromyalgia and one that plaintiff complained of frequently. (Tr. 343, 363, 367, 375, 383, 389, 624). She stated that she regularly needed to rest and had difficulty remembering and concentrating as a result of her fatigue and pain. (Tr. 86, 227, 231). Additionally, as mentioned above, the ALJ entirely discounted plaintiff's "arthritic" pain due to her lack of diagnostic testing. (Tr. 22). As a result, the ALJ failed to include any limitations regarding her diffuse pain into the RFC analysis. Therefore, the ALJ's failure to properly

18

evaluate the limiting effects of plaintiff's fatigue and aching pain is a reversible error.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Trudy Knorr's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: November 17, 2015.**

                                  **s/ Clifford J. Proud**
                                  **CLIFFORD J. PROUD**
                                  **UNITED STATES MAGISTRATE JUDGE**